UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                Plaintiff,<br><br>v.<br><br>HEBER FRANCO-LOMBERA,<br><br>                Defendant. | Case No. 1:10-CR-00221-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

The Court has before it Defendant Heber Franco-Lombera's Motion to Suppress (Dkt. No. 48) in which co-Defendant Francisco Cardona Rodriguez joins. (Dkt. No. 67). The Court heard testimony and oral argument on July 11, 2011, and denied the motion in part. The Court will now deny the motion as to all evidence seized for the reasons expressed below.

**BACKGROUND**

The Government brought charges against Defendant Heber Franco-Lombera for conspiracy to manufacture or distribute 1,000 or more marijuana plants. The charges stem from evidence seized from his home in California which allegedly implicates him as a conspirator to a marijuana growing operation with activities in Oregon and Idaho. He claims that the search and seizure of this evidence violated his 4th Amendment rights, and moves to suppress it. Co-Defendant Francisco Cardona Rodriguez joins in the motion.

Around noon on August 21, 2010 in Bieber, California officers from several law enforcement agencies responded to a report of a gunshot at Franco-Lombera's residence. The

report came from a neighbor. Once a perimeter was established, attempts to contact individuals inside the residence were made several times, in both English and Spanish, over Officer Luntey's PA system.

Co-Defendant Francisco Cardona Rodriguez exited the residence first. He was frisked, handcuffed and placed into the rear of a California Highway Patrol (CHP) squad car. He stated that two additional individuals remained in the residence. Franco-Lombera exited next and was frisked, handcuffed and placed in the rear of Deputy Scott Withrow's Lassen County Sheriff's Office (LCSO) squad car. He told officers that, in the living room, there was a shotgun behind the couch and a pistol within the safe. He noted that the key to the safe was "on the table." *Gov. Exh. A* p. 1. Franco-Lombera also stated that "[Jose Cardona] was in the house when he came out," but later stated that Cardona may be in the vehicle parked behind the residence. *Id.* That vehicle is directly tied to the alleged growing operation with activities in Oregon and Idaho. *See Gandiaga Affidavit* p. 14. Jose Cardona was not inside the vehicle, but officers did see a "green, leafy substance on the floorboard" and noticed "the smell of marijuana coming from inside." *Gov Exh. A* p. 1. Both Franco-Lombera and co-defendant Cardona Rodriguez were asked several times if Jose Cardona may be located inside, and both said he might be inside.

LCSO Officer Kevin Luntey attempted, in Spanish, to explain to Franco-Lombera both the permission to search form as well as his *Miranda* rights. Officer Luntey has had two years of formal Spanish lessons in high school, in 1987 and 1988, with an additional year of Spanish in college in 1989. He has had no other formal training, but testifies he currently uses the Spanish language five to six times a month and has previously served in a law enforcement capacity in Los Angeles, Oakland, and the Williams area of California, where he used it more regularly.

Franco-Lombera was either sitting on the instep of Deputy Withrow's vehicle, or standing beside it, no longer handcuffed, with only Deputy Withrow and Officer Luntey directly present during the conversation. Other armed and observable officers were nearby with weapons drawn. Both Officer Luntey and Deputy Withrow described Franco-Lombera as extremely cooperative and showing no signs of confusion. Their conversation was recorded. For completeness and accuracy, the relevant portions of the translated transcription are reproduced here.

> **Officer Luntey**: OK. For our protection. Do you understand you are not in jail? Do you understand you are not under arrest? (EN) Do you understand that? (EN) (UI) But we want ... talk with you and need to make rights, OK? Do you understand that you I have the rights to, to not say anything?
>
> **Franco-Lombera**: (UI).
>
> **Officer Luntey**: Do you know that you have the right to have an attorney? Do you understand? OK. And you don't have one... the money to pay an attorney, you have the right for the state to pay, OK? Uh, we want you to look in the house for the other person in the house, OK? But this is a paper to give us permission to go in the house and search the house for all the weapons, and drugs and (UI) OK? Do you have a problem if we search the house? There is no problem? Yes or no? There is no problem? Is it OK if we go into your house?
>
> **Franco-Lombera**: Yes, well I already have ...
>
> **Officer Luntey**: And the correct address there? One, zero, four, Fourth Street (EN)?
>
> **Franco-Lombera**: Yeah.
>
> **Officer Luntey**: OK. Is it the green house here? OK? [Officer talking to another agent]. Do you want rights or just content?
>
> **Unidentified Male**: What's that?
>
> **Officer Luntey**: Do you want rights and content?

**Unidentified Male**: Yeah.

**Officer Luntey**: OK.

**Franco-Lombera**: The other guy no here in the house. (EN)

**Officer Luntey**: He's not here? (EN) Where is he?

**Franco-Lombera**: No, I don't know. (EN) (UI)

**Officer Luntey**: OK, these papers say that you give Officer Withrow. Here, Deputy (UI) permission to go into the house and another officer if necessary to go into your house. Are you the owner or do you just live here with you, is there another person that lives there?

**Franco-Lombera**: Only me. (EN) (UI)

**Officer Luntey**: Do you pay the rent?

**Franco-Lombera**: Yeah, I pay the rent. (EN)

* * *

**Officer Luntey**: And all the cars and trucks that are on the property, is it OK if we search here? That are here at the address one, oh, four, First street (EN) too? (UI) And papers and property that we think are important for the investigation, understand? Do you have a problem with that?

**Franco-Lombera**: (UI)

**Officer Luntey**: No, no, yes, we want to look and search for papers, weapons, important property for our investigation.

**Franco-Lombera**: Weapons, (UI) you know weapons, I am...

**Officer Luntey**: Yes, there is a shotgun and a forty-five, right?

**Franco-Lombera**: Yeah. (EN)

**Officer Luntey**: And the keys are on the chair and (UI). And the forty-five (UI). Yes? OK. You don't have a problem if we check the numbers on the weapons?

**Franco-Lombera**: (UI).

>**Officer Luntey**: OK, but it's OK if we look and check the numbers, yes? OK. And ... You give ... You allow us to search for free; you don't give any promises... Do you understand what you say? It's free. No (UI) problem, yes? Do you know that you have ... You know that you have the rights but not (UI) allow us to search? Do you understand this? And it's not a problem? Yes?
>
>**Franco-Lombera**: Yeah, yeah (EN). (UI)
>
>**Officer Luntey**: (UI) search? Is it OK for us to search? OK. That is fine. Thank you. (UI)

*See Gov. Exh*. 2.

Officer Luntey also testified during the suppression hearing that Franco-Lombera often answered with an affirmative nod rather than verbally. Specifically, he testified that when he explained to Franco-Lombera that the consent form would allow officers to enter his residence and search for "weapons, and drugs" Franco-Lombera nodded affirmatively. In response, Officer Luntey sought clarification of Franco-Lombera's answer, and understood the response of "[y]es, well I already have..." to mean that Franco-Lombera had given permission. Officer Luntey also testified that the portion of the transcript between himself and another agent was transcribed incorrectly. Where it reads "[d]o you want rights or just content?" and "[d]o you want rights and content" the word content should be read as consent. After signing the form, Franco-Lombera was again handcuffed and placed into a different vehicle.

Around three-thirty in the afternoon, Franco-Lombera provided a sketch of the layout of the residence to Lassen County S.W.A.T., who then entered and found the residence empty. Deputy Withrow entered first, immediately followed by Officer Woginrich and several other officers. The search consisted of two phases, an initial cursory sweep followed by a careful secondary sweep of possible hiding places, without leaving the residence. The only possible

sign of a gunshot observed by officers was a hole in the bedroom ceiling. While inside, officers saw "several black garbage bags, tarps, and cardboard boxes" which "contain[ed] large amounts of marijuana" in the bathroom as well as fourteen clear garbage bags each "containing a large amount of processed marijuana" in a bedroom closet. *Gov. Exh. B p. 4*. Officers also found a cell phone in the bedroom which Franco-Lombera initially claimed as his but later denied owning. The cell phone contained pictures of what appeared to be marijuana being grown outdoors. *Id.* At 5.

Originally, officers were unable to open the safe in the living room with the key Franco-Lombera identified. Franco-Lombera opened the safe for the officers after reading the accompanying manual, which was in Spanish. Within it, Officer Woginrich found the .45 caliber pistol and 38 rounds of ammunition, a sock full of what appeared to be marijuana seeds and a computer. Officer Woginrich also found the shotgun behind the couch, unloaded. Franco-Lombera later stated that he was getting "about $1,000.00 to let them process marijuana in is (sic) house." *See Gov. Exh. A p. 2*. Other evidence seized includes another cell phone from the bedroom and a receipt in the living room. *Gov. Exh. C*.

## ANALYSIS

1.    **Consent**

There is no dispute that officers searched Franco-Lombera's residence without a warrant. A warrantless search is unconstitutional unless the government demonstrates that it "fall[s] within certain established and well-defined exceptions to the warrant clause." *U.S. v. Murphy*, 516 F.3d 1117, 1120 (9th Cir.2008). Consent constitutes one

such exception: "[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether consent was given depends upon the totality of the circumstances. *U.S. v. Drayton*, 536 U.S. 194, 207 (2002). The existence or absence of any one factor is not dispositive. *Id*. The government bears the burden of proving that consent was voluntary. *U.S. v. Brown*, 563 F.3d 410 (9th Cir. 2009). "The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *U.S. v. Cunag*, 386 F.3d 888, 894 (9th Cir. 2004) *(*quoting *U.S. v. Matlock*, 415 U.S. 164, 178 n.14 (1974)).

To help determine whether an individual consented to a search, the Ninth Circuit considers five nonexclusive factors: (1) whether the consenting individual was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the consenting individual was notified of the right to refuse consent; and (5) whether the consenting individual had been told a search warrant could be obtained. *Brown*, 563 F.3d at 415. A person will be found to have been in custody if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business." *Id*.

Here, Franco-Lombera argues that the Government has not met its burden for two reasons: (1) the language barrier prevents the permission to search form and audio

transcription from establishing a valid consent; and (2) that even if the consent was voluntary, the ensuing search exceeded the scope of the consent. The Court disagrees.

The Court finds that although some of the Ninth Circuit's nonexclusive factors may tip in Franco-Lombera's favor, the totality of the circumstances indicate that he voluntarily consented to the search. Franco-Lombera is correct that a reasonable person who had been handcuffed in the back of a squad car, with law enforcement surrounding his residence, would not feel free to leave, and would be considered in custody. Moreover, guns were undoubtedly drawn and observable when Franco-Lombera signed the form. Additionally, insufficient *Miranda* rights may have been given. In a vacuum, these factors may suggest Franco-Lombera's consent was not voluntary. However, a closer look at the totality of the circumstances indicates otherwise.

The guns were drawn because there had been a report of a gunshot, and officers were told that another individual was in the residence. Moreover, there is no evidence that any officers involved in the conversation with Franco-Lombera regarding the consent form had drawn his weapon. Additionally, although Franco-Lombera could have observed officers with guns drawn, he would also have observed that the guns were not pointed in his direction. This suggests a lack of coercion.

As for the potentially insufficient *Miranda* rights, although Franco-Lombera was not informed that anything he said could be used against him in a court of law, this is not dispositive on the issue of voluntariness. An improper reading of *Miranda* rights, under

these facts, does not suggest coercion. Franco-Lombera was also informed that he could refuse consent and made no objections. Additionally, there is no evidence that the officers told Franco-Lombera that a warrant could be obtained. Accordingly, the Ninth Circuit's five nonexclusive factors seem to cut both ways.

However, under the totality of the circumstances, the Court finds that Franco-Lombera consented. Notably, during the explanation of the consent form, Officer Luntey emphasized that law enforcement wanted to search for "papers, weapons, [and] important property" for an investigation. *Gov. Exh. 2* at pp. 2, 3, 4 (Dkt. No. 61-2). At one point, the officer also mentioned that the search would be for drugs. *Id.* at p. 2. He emphasized that the papers gave officers permission to enter Franco-Lombera's residence. *Id.* at p. 5. In response, Franco-Lombera told officers about weapons in the residence, and he authorized officers to check the numbers on them. *Id.* at p. 6. When told he could refuse the search, Franco-Lombera stated that he understood and made no objections. *Id.* at p. 7. Franco-Lombera's general cooperative nature and failure to indicate any confusion or disagreement during the conversation has also been corroborated by the testimonies of Deputy Withrow and Officer Luntey at the suppression hearing. Officer Luntey testified that Franco-Lombera often answered with an affirmative nod, and that when he explained to Franco-Lombera that the consent form would allow officers to enter his residence and search for "weapons, and drugs" Franco-Lombera nodded affirmatively.

The Court agrees that a defendant's alleged difficulty with the English language should also be considered under a totality of the circumstances test. However, while a

language barrier may suggest it is easier for officers to coerce a suspect, it does not necessarily mean the officers did so. Although Officer Luntey did not translate the form verbatim, he did track the significant elements of it. Compare *Gov. Exh. 2* with *Gov. Exh. 1*. The vast majority of the conversation took place in Franco-Lombera's native tongue, and Franco-Lombera did not indicate confusion or misunderstanding. Further, Franco-Lombera occasionally responded to Officer Luntey in English and opened the safe for Deputy Withrow, who had asked him how to do so in English.

Moreover, Franco-Lombera's statements and actions at the time of the consent contradict the statements in his affidavit filed the day of the suppression hearing. In the affidavit, Franco-Lombera states that he "did not know what was going on," "could not understand what the officer was asking when discussing the form," and that it was "apparent to [him] the officers wanted [him] to sign the form although [he] did not know what it said." *Aff. Franco-Lombera*, at 2 (Dkt. No. 66). These few statements are in conflict with the totality of the circumstances. As indicated above, the record includes testimony of the officers present at the time of the conversation indicating that Franco-Lombera responded as though he understand the conversation.

The Court acknowledges that the conversation surrounding the permission to search form is not altogether clear. The quality of the Spanish being spoken is poor. There are a large number of unintelligible sections and it is difficult to clearly match questions to answers. For example, there is no single instance where Franco-Lombera

clearly responds affirmatively to a request to search his residence. Even the section of the transcript where Officer Luntey testified that Franco-Lombera had consented is almost immediately followed by Officer Luntey asking a fellow agent if he should obtain consent.

In spite these deficiencies, the Court finds that the totality of the circumstances indicates that Franco-Lombera consented to the search. Absolute certainty that Franco-Lombera understood every word Officer Lunte spoke may not be attainable, but that is not what is required at this stage. It is enough to establish that, more likely than not, Franco-Lombera understood what would happen if he signed the form. That is the case here. The most reasonable conclusions the Court can draw from the transcript are: (1) when told he could refuse the search, Franco-Lombera understood, *Gov Exh. 2* at 4, l. 33 to 5, l. 5; (2) when told the form would allow officers to search his residence, he understood, *id.* at 3, ll. 12-16; (3) when told what the officers would search for, he understood, *id.* at 4, ll. 8-14; and (4) he provides no indication that he is confused. *See id.* A reasonable person, understanding these things, would not have signed the form if he did not consent to a search of his residence. Franco-Lombera signed the permission to search form.

Under these circumstances, the Government has carried its burden by establishing by a preponderance of the evidence that Franco-Lombera consented to the search of his residence. The language barrier did not pose problems significant enough to establish a

lack of intelligent and voluntary consent, and the emphasis of key points by Officer Luntey demonstrates the consent was specific and unequivocal. Accordingly, the Court finds that Franco-Lombera voluntarily consented to the search of his residence.

**2.   Scope**

The Defendant makes much of the distinction between the primary and secondary search or sweep. The distinction makes no difference under the circumstances of this case. The "continuance" rule espoused by Franco-Lombera does not apply here because the officers performed a single search of the residence. The scope of consent is determined by objective reasonableness. That is, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *U.S. v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006) (quoting *Florida v. Jimeno*, 500 U.S. 248, 252 (1991)). The Court finds that a reasonable person observing the conversation, witnessing affirmative nods, no objections, and no apparent confusion would understand that Franco-Lombera had consented without limitation. Furthermore, the second, more careful sweep of the residence was still no more than a cursory glance into places in which a person is likely to hide, and is not grounds finding that the scope of their search was excessive. Accordingly, the Court will not exclude any evidence seized by the officers during the search.

## CONCLUSION

Officers constitutionally entered the residence of Franco-Lombera under the

community care exception to a warrantless searches, as indicated during the hearing. Accordingly, the marijuana and shotgun were seized during a lawful search under the plain view doctrine. Moreover, Franco-Lombera voluntarily consented to a search of his residence, including the safe. Accordingly, Franco-Lombera's motion to suppress is denied in all respects. Defendant Cardona Rodriguez' joint motion is also denied because Franco-Lombera gave consent.

## ORDER

**IT IS ORDERED:**

1. Defendant's Motion to Suppress (Dkt. 48) is **DENIED**.

2. Defendant's Joinder in Motion to Suppress (Dkt. 67) is **DENIED**.

DATED: **July 20, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge